Filed 7/21/25  Doe v. Accor Hotels & Resorts (Maryland) CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JANE DOE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>ACCOR HOTELS & RESORTS (MARYLAND), LLC, et al.,<br><br>        Defendants and Respondents. | A167247, A167591<br><br>(Alameda County<br>Super. Ct. No. RG18923197) |

Jane Doe alleges that she was sexually assaulted by JB, a massage therapist at the Claremont Hotel.  She filed the underlying action against JB and multiple entities associated with the Claremont, three of which are respondents in the present appeal (the Claremont or the Claremont defendants).[1]  Doe dismissed her claims against JB, but she proceeded to trial against the Claremont defendants on the theory they were liable for JB's conduct and for mishandling Doe's complaint.  The jury found that JB did not intentionally make sexually offensive contact with Doe, nor was he negligent.  Thereafter, the court entered judgment in favor of the Claremont.  On appeal,

---

[1]  The Claremont defendants include the hotel's operator, Accor Hotels & Resorts (Maryland), LLC (Accor); its property manager, FHR Claremont Hotel Management Company, LLC (FHR); and Claremont Hotel Properties, LLC (Claremont Properties), the property owner.  Like the parties, we refer to appellant as Jane Doe.  We use the acronym JB to refer to the man Doe accused, who was absolved of wrongdoing by the jury.

1

Doe seeks a new trial, alleging evidence and instructional errors. She also appeals postjudgment orders awarding the Claremont costs and fees. We affirm.

## BACKGROUND

### *The December 2017 Incident*

On December 30, 2017, Jane Doe called the Claremont to make an appointment for a therapeutic massage. Earlier that day, Doe had returned home from a difficult visit with her daughter, who was in a residential facility in Utah receiving treatment for a rape she suffered the previous summer. Doe decided to get a year-end massage so she could relax and let somebody else take care of her. She booked her appointment with JB, an experienced therapist who had given Doe massages on prior occasions. At trial, Doe and JB both testified about the massage.

#### *Doe's Testimony*

Doe began her testimony by telling the jury that she brought this action because JB physically grabbed her breasts and the Claremont Hotel had been "gaslighting" her ever since she reported the incident. Doe demonstrated for the jury how JB allegedly touched her, testifying that he "put his hands between my breasts, between my breasts, such that I had to physically remove both his hands from between my breasts, between my breasts, over the sheet between my breasts." Doe testified that after she complained about JB, the Claremont defendants totally humiliated, dehumanized and demoralized her. Then Doe shared information about her background so the jury could get to know her. She talked about her professional career as an attorney as well as her personal history, and she described how the Claremont had once been a special and safe place for her. And yet, she testified, after the incident with JB, nobody at the Claremont

2

responded to her calls or messages; they instead told her that the incident never happened.

Doe testified that when she arrived for her massage on December 30, 2017, she felt like she had made it through a rough year and was at a place where she could let her guard down. JB waited outside the massage room while Doe took off her robe, and lay face down on the table, covering herself with a sheet and blanket so that she was naked under the sheet. JB entered the room, and initially the massage proceeded as Doe had expected. JB massaged Doe's arms and replaced them away from her body on the table; he pulled the sheet and blanket down below her back to the top of her buttocks; and he placed his thumbs on the sides of her spine and made sweeping motions up her back. The sweeping motion was standard and "par for the course" in Doe's experience, but as JB moved up her back, his fingers touched the sides of her breasts, something that had never happened to her before. At the time, Doe thought it was an accident and she was embarrassed because she has "had large breasts all [her] life and they have been the source of a lot of unwanted attention." She was "immediately" aware that she was in a vulnerable position, but did not want to call attention to her breasts, so she slowly moved her arms toward her sides, hoping JB would not notice what she was doing.

Doe recalled that, as JB continued to massage her back the pressure increased, as if JB was angry, and Doe felt like she was "being massaged now like a piece of meat." Doe said nothing, however, because JB had not crossed "a boundary," and she needed a massage. When JB finished with Doe's back, he said " 'roll over,' " in a tone Doe had not heard during any of her prior massages and found jarring. As Doe resituated and pulled her arms from beneath the cover, she realized there was only one layer—she was used to

3

having a blanket over the sheet, but there was only a sheet—and she became concerned that her nipples could be seen through the sheet. JB saw her concern and began "fussing" with the sheet, causing it to rub up and down on Doe's nipples, which became more erect, she testified. Then he began massaging her collar bone and chest area above the tops of her breasts. Doe acknowledged this part of the massage was normal, but as JB moved towards her breasts, her nipples were getting hard and she told him " 'that's too close.' " In response, JB apologized and "back[ed]" off.

Doe testified that JB used a pillowcase to cover Doe's eyes, which was something he always did, but no other therapist had covered her eyes that way during a massage. Doe used a scarf to demonstrate for the jury as she testified that JB crisscrossed the pillowcase from her jaw up over her eyes and tucked it behind her head so that it was "totally dark" and she could not "see anything." Doe described how JB proceeded to reposition her head, first to the right and then the left, each time breathing loudly very close to her ear. Doe recalled that she could feel JB's "mouth or breath" over her ear, and she demonstrated for the jury how he exhaled near her ear, which was something he had never done before. Doe told the jury that she did not know how close JB was to her ear, testifying over a defense objection that she had been "blindfolded."

Then Doe testified, as she demonstrated for the jury: "he puts both of his hands on both of my breasts, between my breasts with the palms of his hands, both hands on the flesh of both of my breasts." Doe recalled that she responded almost immediately by grabbing JB's hands, removing them from her breasts, and saying, " 'No, that's not okay.' " But then she "froze[]" up because she was shocked and "freaked out" that JB did not respond when she said it was not okay. Subsequently, when JB pulled back the sheet and

4

touched her leg, Doe panicked. She sat up, pulled the sheet close, took the cover off her eyes and told JB, " 'this massage is over.' " JB asked, " 'are we okay,' " and Doe said yes because she needed to get out of the room. JB waited outside while Doe prepared to go, then offered her water and walked her to the locker room.

Doe testified that she had been unsure of the " 'protocol' " for what had just happened to her, so she went to speak to a manager. She told Ms. Smith-Webb that she had just " 'physically had to remove' " JB's hands from both of her breasts. According to Doe, Smith-Webb was caught completely off guard by Doe's report and went into shock. In response, Doe immediately went into "caretaking mode" because of "who I am and the work that I do," and because she wanted to make things " 'okay' " for Smith-Webb. The two spoke for about 10 minutes, and Doe recounted some things JB had done. Smith-Webb told Doe to speak to security. Doe declined because she did not want to "deal with it," but she changed her mind while she was taking a shower. She was in the lobby waiting for a security officer when JB walked by and smiled at her. Doe smiled back because she is "so conditioned as a woman to make nice."[2] But she testified the encounter made her feel unsafe because Smith-Webb had just assured her that she would not have to see JB again.

Doe had a 20 to 30 minute meeting with a security officer, Mr. Smith. Doe got the impression Smith was caught off guard by her complaint, and she thought him ill-prepared. He had a note pad but did not take notes, he seemed embarrassed when Doe demonstrated what JB had done, and he declined Doe's offer to give a written statement.

---

[2] The encounter in the lobby was captured on surveillance video and played for the jury at trial.

5

A few days later, Doe made a police report about the incident, stating that she had been sexually assaulted. She also made a report to the California Massage Therapy Counsel. She testified that she attempted to contact the Claremont, but her calls and messages were not answered. Doe felt a "massive" sense of betrayal by the way the Claremont treated her because she had been a valued guest, and the hotel had been her "sanctuary from what was going on in [her] life." After she reported the incident, Doe felt that people who used to make her feel safe "stripped" her of her dignity and "went after [her]."

### JB's Testimony

JB immigrated to the United States as a young man and began working at the Claremont in 1994. After a few years, he decided to become a massage therapist to increase his income, so he went for training at the McKinnon Institute in Oakland. JB received more than 500 hours of training at McKinnon, learning multiple techniques as well as standard practices, such has how properly to drape a client during the massage. JB testified that he was also taught that women's breasts are off limit, must be covered at all times and are not to be exposed, a rule that he always followed. JB estimated that he had administered approximately 20,000 massages during his career. Jane Doe had been a regular client, having requested therapeutic massages from him multiple times. All of the massages he gave Doe involved massaging her upper pectoral region, and prior to the incident in question there had never been any issues, nor had she ever expressed discomfort with a massage of that area.

JB recalled that on December 30, 2017, he gave approximately four massages before he saw Jane Doe. It was a warm day, so he did not cover any of his clients with the blanket that was kept in the room. Using a

blanket to give an extra layer of warmth was optional but not required. The sheet he used to cover Doe was provided by the Claremont and JB did not think it was see-through. During the massage, Doe did not say anything about the sheet or its draping or about being uncomfortable with just a sheet.

JB testified that when Doe was face down during the massage, he did not touch the sides of her breasts. He described the technique he used to massage Doe's back and its importance, and he recalled that Doe said nothing during that part of the massage to indicate anything had gone wrong. JB testified that he always asked the client about the level of pressure to use and Doe had requested firm pressure. JB also testified about the care he takes when a client turns over during a massage so that the sheet does not "fall all over the place." Because he has a limited English vocabulary, he usually just says " 'turn over,' " and then employs a tenting technique, which gives the client room to move. JB covered Doe with the sheet and used the tenting method when she turned over, JB testified, "the same way I've been doing for thousands of people."

After Doe turned over, the sheet was draped by folding a double layer over her chest and tucking in the sides. JB testified that it is important to always make sure the sheet is tucked tight for the comfort of the client; if it is not tucked tight enough, moving the head or the arm could expose someone. After Doe turned over, JB used the king-sized pillowcase that had been cushioning Doe's face to fashion an eye cover by crossing it over her eyes but not her nose and not fastening it to anything. JB explained the value of the eye covering to promote relaxation, reduce distraction, and help with light transitioning. He used the same technique with all his clients and with Doe in the past. During the portion of the massage when JB was working on Doe's head and neck, he practiced active breathing as a reminder that she

7

should do the same.  He was close to her because he was giving a massage but he did not invade her space.  There was nothing sexual about his breathing, JB testified.

Then JB massaged Doe's upper pectoral region, he testified, recalling that during this portion of the massage Doe gave her first feedback, saying " 'too close.' "  JB did not know what Doe meant, but he accepted her feedback by moving his hands and returning to her neck area.  While his hands were behind Doe's neck, around her upper pectoral muscle, Doe said, " 'That's it,' " and grabbed JB's hands.  He jumped back because the client is not supposed to touch him, and then he asked if Doe was okay.  Doe said she was okay.  Then JB asked Doe if she wanted him to continue and she said yes.  After that, JB moved on to arms and legs.  He was working on the first leg when Doe asked the time, he told her the time, and then she said something like, " '[t]hat's all' " or " 'It's finished.' "  At that point, the allotted time had passed and the massage ended.

JB adamantly denied ever touching Jane Doe's breasts:  "I keep saying it over, and I've been saying it for five years.  I did not and I wouldn't and I did absolutely not put my hand on top of her breasts.  I did not grab her breasts."  JB testified that he had trouble responding to Doe's criticisms because it seemed like "we were in a totally different sphere.  I was in my world.  She was in hers.  My world was about taking care of her, making her feel comfortable, helping her to heal.  It seems like her world, she was thinking about sex, harming, things like that. . . .  We were in a totally different environment."

### Claremont's Investigation

Ms. Smith-Webb was the spa services manager at the Claremont on December 30, 2017.  She was responsible for supervising employees,

including JB, but she was not trained about massage techniques. Smith-Webb testified that when Doe made her complaint about JB, the first thing Doe said was that she had to remove JB's hands off of her breast. Smith-Webb was shocked by this remark, but Doe laughed about it and the conversation lightened. Smith-Webb asked if Doe could provide details about the encounter and Doe shared that she had very little feeling in her breast area due to a breast reduction operation, and yet she had felt " 'a lot of tugging in the breast area.' " For the remainder of the conversation Doe did not ever say or indicate that JB had placed his hands on top of her breasts. Nor did she report that JB grazed the sides of her breasts with his fingertips. Doe complained about "draping," but she also stated that she had not been exposed. Smith-Webb was left with the impression that Doe objected to JB touching her upper pectoral region. She advised Doe to speak to the security guard, but Doe declined. A short time later, Doe returned and told Smith-Webb that she was upset JB had not apologized, the more she thought about it the madder she became, and she wanted to speak with security after all.

Mr. Smith, the security officer who took Doe's complaint, testified that his job at the Claremont was to observe and report. He was not responsible for investigating Doe's complaint, but he did complete an incident report, which described the incident as an " 'alleged inappropriate touching.' " As reflected in his report, Smith asked if Doe was okay, Doe said she was, and then he asked her what had happened, recording her allegations in his report. Doe reported that the massage therapist did not cover her with a blanket, only a sheet; that he made her feel uncomfortable, " 'at times making contact with her bare breasts to the point where she asked him to stop' "; and that he did not apologize or acknowledge her discomfort.

Ms. Parks is a director of spa operations at the Claremont. She

9

previously worked as a massage therapist and her responsibilities as a director include working with the human resources department to hire massage therapists. Parks testified that she was off work when Doe made her complaint against JB. However, Smith-Webb contacted her for guidance about how to handle that complaint. Based on the information Smith-Webb shared with her, Parks believed that Doe was upset because when JB massaged Doe's pectoral area, Doe perceived that as being too close to the actual breast. His hands were close enough to Doe's breast area that "she felt uncomfortable and physically put her hands on to remove them." Parks testified that after Smith-Webb conveyed Doe's complaint to her, she directed Smith-Webb to offer Doe a security report. Then Parks immediately sent an email to her director of human resources to get further direction because Doe's complaint was "severe" and "involved the breasts."

At trial, Parks confirmed that the Claremont's policies prohibit inappropriate touching of the breasts or intentional touching of the breasts. She clarified that there are times during a message when a breast may be grazed on the side, accidentally. Parks also confirmed that if an employee violated the company's policy against sexual assault or harassment, that would result in termination.

Doe's complaint was investigated by Mr. Zarate, the Claremont's director of human resources. Zarate testified that the Claremont took Doe's complaint seriously and that he conducted a fair and thorough investigation, with assistance from Ms. Smith-Webb. Smith-Webb assisted Zarate because she had taken Doe's complaint and had subject matter expertise with respect to the spa and its services. Zarate, who did not know JB personally, had the authority to fire employees and would have had no difficulty doing so if he had determined that JB behaved inappropriately. In conducting the

10

Claremont's investigation, there was absolutely no bias in favor of JB, Zarate testified. Nor was there any bias against Doe.

Zarate testified that he discussed the substance of Doe's complaint with Smith-Webb and then they interviewed JB. JB appeared for his interview accompanied by the shop steward. He was told that Doe had made a serious complaint, but no other details. It was important, Zarate testified, for JB to be kept in the dark about what Doe had reported so that he would not alter or tailor his account of the incident. After JB finished describing the massage that he performed for Doe, Smith-Webb asked JB if Doe had to physically remove JB's hands from her breasts. JB said that absolutely did not happen. His demeanor was genuine and he was shocked by the allegation, Zarate recalled.

Zarate did not interview Doe about her complaint because she had already given statements to Smith-Webb and Smith, and Zarate had met with both of those individuals about the incident. Neither Smith-Webb nor Smith had conveyed any negative impressions of Doe to Zarate. Other factors Zarate considered included Doe's history as a longtime guest, JB's history as a longtime employee, the fact that Doe did not have a history of making complaints, and the fact that JB had a long history of not receiving complaints. Ultimately, Zarate made the decision not to terminate JB's employment because, "based on reviewing all of the information, statements, we did not find [JB] to have inappropriately touched Ms. Doe." Zarate testified that nobody from the Claremont contacted Jane Doe directly about the outcome of their investigation because on January 16, 2018, the Claremont received a letter from Doe's attorney stating that any correspondence pertaining to Doe be directed to her attorney.

11

***Doe's Lawsuit***

Doe filed the underlying action in September 2018. In her operative first amended complaint, Doe alleged claims against the Claremont defendants for negligence and unlawful business practices. Doe's allegations in support of her negligence claim included that the Claremont failed to use reasonable care to ensure the safety of their patrons, including Doe; and that they negligently retained and supervised JB. Doe alleged further that, "[a]s a result of [the Claremont's] failure to use reasonable care to ensure the safety of [Doe], and/or as a result of [JB] being negligently retained and/or supervised in the employment of [the Claremont]," Doe "was assaulted, harassed, battered, and/or negligently touched, to her detriment."

Doe also included in her complaint, claims against the Claremont and JB for acts or threats of violence, sexual harassment, battery and/or sexual battery, and assault. And she alleged a separate claim for negligence against JB. In her prayer for relief, Doe sought general and special damages, civil penalties and punitive damages. She also sought injunctive relief against the Claremont, including an order barring them from employing JB and requiring them to follow specified procedures when investigating future complaints of sexual assault or harassment.

A jury trial was scheduled for January 2022, but was continued until October. On September 13, Doe dismissed her claims against JB, ostensibly without prejudice. Prior to opening statements, the court described Doe's remaining claims to the jury by reading the parties' joint statement, which summarized their respective allegations as follows: Doe alleged that she was sexually assaulted and harassed by JB during the December 2017 massage, and that the Claremont defendants were responsible for JB's conduct because they (1) negligently supervised, trained and retained JB, and (2) ratified JB's

inappropriate conduct. Doe alleged further that the Claremont was liable to her for compensatory and punitive damages. The Claremont defendants denied that Jane Doe was sexually assaulted or harassed, contended that Doe falsely accused JB of inappropriate conduct, and denied all wrongdoing.

The evidence phase of trial was conducted over multiple court days in October and November 2022. After the close of evidence, Claremont Properties moved for a directed verdict, which the trial court granted. The court also granted the remaining Claremont defendants a directed verdict as to Doe's claims for acts or threats of violence and sexual harassment. And the court granted Doe a directed verdict with respect to two issues, finding that (1) JB was a special employee or agent of Accor, the hotel operator; and (2) the Claremont ratified JB's conduct.

The jury made findings by completing a special verdict. The special verdict form contained a total of 11 questions and the jury answered two, as follows:

> 1. Did [JB] intend to cause a harmful or offensive contact with Jane Doe's breasts, and a sexually offensive contact with Jane Doe resulted, either directly or indirectly?
> ____ Yes __X__ No
> *If you answered yes, answer question 2. If you answered no, answer question 4.*
> [¶]. . . [¶]

> 4. Was [JB] negligent?
> ____ Yes __X__ No
> *If you answered yes, answer question 5.*
> [¶]. . . [¶]
> *If you answered no, and either answered no to question 3 or did not answer question 3, stop here, answer no further questions, and have the presiding juror sign and date the verdict form.*[3]

---

[3] Question 3 asked if Doe was harmed or offended by JB's conduct. The jury did not answer that question.

Following entry of the verdict, Doe filed a motion for new trial, which was denied. A November 10, 2022, judgment in favor of the defendants incorporates the jury's findings and provides that Doe shall take nothing from the Claremont defendants. Pursuant to postjudgment proceedings, the court awarded the Claremont costs and attorney's fees. Doe filed separate appeals from the judgment and postjudgment orders, which were consolidated in this court.

## DISCUSSION

### I. Evidence Issues

Doe challenges three evidentiary rulings by the trial court. She contends first that the court erred by permitting JB to demonstrate his massage techniques for the jury. Second, Doe contends that the Claremont defendants' expert psychologist should not have been permitted to testify at trial. Finally, Doe argues the court erred by excluding evidence of "similar incidents." " 'Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion.' [Citation.] The trial court's 'discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered.' " (*Meeks v. AutoZone, Inc.* (2018) 24 Cal.App.5th 855, 861.)

### A. Demonstration Evidence

Because trial was held during the COVID pandemic, witnesses and jurors appeared by video. When Doe called JB as a witness during her case in chief, he testified from a room at the Claremont. After both parties examined JB, the court permitted him to demonstrate his massage techniques from the massage room where he had performed Doe's massage. Doe contends this ruling was error.

14

### 1. Additional Background

Guided by questions from defense counsel, JB conducted a condensed version of the therapeutic massage he provided to his clients. A volunteer named Brandy acted as the client and JB demonstrated various procedures, such as draping, and massage techniques, including effleurage, which is performed on the back, and the technique he used to massage upper pectoral muscles.

During the demonstration, defense counsel asked questions about Doe's massage. For example, while JB demonstrated draping, he testified that was the way he draped Doe when she turned onto her back. He also testified that he could not see Doe's nipples through the sheet, nor did he try to see them. JB also testified that he covered Doe's eyes with a pillowcase in the same manner that he demonstrated on Brandy, and that the covering was not tied or bound in any way. And, while using Brandy to demonstrate how he massaged the upper pectoral muscles, JB showed where his hands were placed when Doe said he was too close, and where his hands were when Doe grabbed them.

After JB completed his demonstration, Doe's counsel elected to conduct his redirect examination in the massage room. Doe's counsel characterized the demonstration as a performance, but JB denied having practiced it with Brandy or having videotaped it. JB also disagreed with counsel that the demonstration was "very different" from the massage JB gave Doe in December 2017.

### 2. Analysis

A demonstration or reconstruction is admissible as evidence if (1) it is relevant, (2) its conditions are substantially similar to those existing at the time of the alleged occurrence, and (3) it is not unduly time consuming,

15

confusing or prejudicial. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1318; *Culpepper v. Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 522.)

Doe contends that the trial court "acted contrary to law" by permitting JB's demonstration without finding that it was substantially similar to the alleged occurrence, and that this required finding could not have been made under the facts of this case. We reject both prongs of this argument. When defense counsel first raised the issue of having JB demonstrate his massage techniques, the court recognized there could be issues about whether it would be substantially similar to the event that JB described. Subsequently, Doe filed written objections to the proposed demonstration, arguing that it would not be conducted under substantially similar conditions as those of the actual occurrence. The trial court necessarily found otherwise by admitting this evidence. Indeed, before the demonstration was performed, the court stated on the record that it had considered all of Doe's objections, found they were not "persuasive" and "rejected them." Furthermore, to the extent Doe argues that the demonstration JB ultimately conducted for the jury was not substantially similar to the alleged event, we disagree.[4] JB's testimony prior to and during the demonstration establishes that the demonstration was substantially similar to his account of what happened during the event in question.

In a section of the appellant's opening brief that purports to summarize procedural facts, Doe argues that JB's demonstration was dissimilar from the actual event because JB used a volunteer who had a different body type than

---

[4] The appellate record contains an order after hearing denying Doe's motion for a new trial which reflects that the court rejected Doe's claim that JB's demonstration should not have been admitted. However, Doe elected not to include a copy of her new trial motion in her Appellant's Appendix.

16

Doe, and who was not naked—as Doe had been during her massage. These differences are logistical, and we disagree that they prevented JB from performing a substantially similar demonstration of the techniques he employed during Doe's massage. Doe also complains that during the demonstration, Brandy did not make the same movements or statements that Doe made during her massage. The record shows it was Doe's counsel who insisted that Brandy not speak or move during the demonstration. Regardless, this demonstration was not offered or admitted as evidence of what Doe did. This was a demonstration of what JB did during the massage, and JB's testimony supplied the requisite foundation for it.

Doe also contends JB's demonstration should have been excluded because it was inherently misleading. As support for this argument, Doe cites *People v. Dabb* (1948) 32 Cal.2d 491, 498 (*Dabb*). *Dabb* was an appeal by three defendants convicted of committing a 1947 murder. (*Id.* at p. 494.) The *Dabb* court found that evidence of the defendants' oral and written confessions was properly admitted at trial. (*Id.* at pp. 496–497.) The Court also found no error in the admission of "three sound motion pictures," during which the defendants voluntarily reenacted their crimes with a police officer acting as the decedent. (*Id.* at pp. 497–499.) In reaching this later conclusion, the Court observed that a "motion picture of the artificial recreation of an event may unduly accentuate certain phases of the happening," and because of the "forceful impression" it can make on the jury, such evidence should be "received with caution." (*Id. at* p. 498.) The danger, the court explained, was that a jury might forget that it was just watching a movie and not the thing that actually happened. However, the Court found, when the motion picture consists of a voluntary reenactment by the accused

17

of what occurred there is little danger of a misleading emphasis that would be unfavorable to him.  (*Id*. at pp. 498–499.)

*Dabb* does not assist Doe in any material way.  This is not an appeal from a criminal conviction, nobody confessed to a crime, and no moving picture was admitted into evidence.  Although JB's demonstration was an artificial recreation of an event, he did not "unduly accentuate certain phases" (*Dabb*, *supra*, 32 Cal.2d at p. 498), but instead accentuated only those phases that Doe herself had targeted.  Moreover, there is no reasonable basis for the suggestion that this jury could have been confused, deceived, or misled into believing that any of the demonstrations performed during trial were the actual event that precipitated this litigation.

Finally, we reject Doe's argument that JB's demonstration was more prejudicial than probative.  (Evid. Code, § 352.)  We disagree with her conclusory assertion that there was no probative value in showing the jury how JB performed a standard therapeutic massage, which overlooks that JB testified repeatedly that he gave Doe his standard massage.  Nor are we persuaded by Doe's contention that the demonstration was unduly prejudicial because it bolstered JB's account.  This evidence was presented to the jury as a demonstration of JB's account.  Doe's characterization of it as misleading and prejudicial rests on the erroneous premise that her version of the event must be accepted as true.

## B.  Defense Expert's Testimony

The jury heard testimony from two expert psychologists; Dr. Anthony Reading testified on behalf of Doe, and Dr. Joanna Berg was called by the defense.  Prior to trial, Doe had filed a motion to exclude Berg's testimony as an improper opinion about whether or not Doe was assaulted.  The court denied Doe's request for a pretrial order and deferred ruling on specific

18

objections regarding Berg's qualifications to render an expert opinion on a given issue, which the court would rule upon "on a question-by-question basis." On appeal, Doe renews her sweeping objection to Berg's testimony.

### 1. Additional Background

At trial, Doe elicited testimony from two health care providers who treated her in the aftermath of the December 2017 incident. Dr. Orah Krug, a marriage and family therapist, diagnosed Doe with a general anxiety disorder in 2012 and treated Doe at various times thereafter. In 2017, Krug attempted to assist Doe with issues pertaining to sexual abuse after Doe's daughter was attacked during an encounter that paralleled an experience Doe had when she was a teenager. After a session in September 2017, Krug did not see Doe again until March 2018, when Doe shared with Krug that she had been sexually assaulted by a massage therapist at the Claremont and " 'decided to litigate.' " Krug testified that Doe reported that "she was very upset because she felt assaulted," had not given "permission" to be touched, and "felt very invaded." Krug's notes from the session did not contain details about the nature of the assault that Doe reported, and Krug could not recall what Doe had said about it. But Krug recalled that Doe certainly seemed traumatized by the event. "She was having intruding memories, and they were activating her into feelings of panic and anxiety which is a sign of trauma," Krug testified.

Doe also elicited testimony from Angela Porter, a family and marriage counselor who treats trauma, and who treated Doe from June 2019 until February 2022. Porter testified that Doe reported she suffered a sexual assault and was having panic attacks, but Porter could not recall details about the issues Doe was experiencing. Porter did confirm, under cross-examination, that Doe was hypersensitive and hypervigilant about her

19

breasts, and that she talked about getting a lot of attention about her breasts.

Doe's expert psychologist, Dr. Reading, testified about Doe's history of psychological stressors, including suffering sexual abuse as a teenager, receiving unwanted attention to her breasts, and having a daughter who was sexually assaulted. Reading also discussed psychological tests he administered to Doe. In Reading's opinion, the results of those tests "ruled out" the conclusion that Doe was "over-reporting" her symptoms, and did not support finding that Doe had presented a "self-serving version of events." Based on his psychological evaluation of Doe, Reading did not find any indication that Doe "misperceived what happened to her at The Claremont." Nor did he believe that Doe was seeking validation by "going public" with what happened to her.

Reading offered the opinion that the incident that led to this litigation caused Doe's preexisting acute stress disorder to develop into a posttraumatic stress disorder, and that she also developed an adjustment disorder with depressed mood. Reading explained that it was not his role to determine whether the event that Doe described actually occurred, but to explain psychological processes that might be relevant if it did occur. Reading did not diagnose Doe with a thought disorder, but he acknowledged that testing he administered showed that Doe displayed a high elevation of unusual thoughts.

Dr. Berg was retained as an expert by the defense to evaluate Doe with respect to her psychological functioning and her response to events that she alleged happened at the Claremont. Berg's testing showed that Doe has "some degree" of anxiety, social avoidance and heightened emotionality. Berg testified that the results of the tests she administered to Doe were largely

consistent with test results obtained by Dr. Reading, particularly as to Reading's finding that Doe was "quite elevated" on the scale relating to a thought disorder. According to Berg, this means Doe "can have distorted perceptions and form misjudgments" in the sense that Doe can think about a situation in a manner that others would not necessarily agree with.

Based on her testing and understanding of Doe's history, Berg concluded that Doe has a heightened sensitivity to perceiving things in a particular way. Specifically, Doe displays a strong need for respect and value, and she has a "highly sexualized sensitivity around men and her feelings of her breasts." Berg testified that Doe displayed these sensitivities when she described her experiences at the Claremont and the incident with JB. Berg also testified that she, Dr. Reading, and Doe's therapist, Ms. Porter, had observed Doe to be hypervigilant, a state that can somewhat distort thinking.

In Berg's opinion, when Doe arrived at the Claremont for her massage she was in an "internal state of agitation." Doe's description of how she was feeling that day, in terms of her emotional state, was evidence that her "psychological defense mechanism" had been activated. Berg opined further that when Doe's emotional state was combined with her issues about sexualization, particularly sensitivities as to her breasts, there would be a "reaction of hypersensitivity, hypervigilance, and some thinking and judgment issues that may be misjudgments, misperceptions."

Berg diagnosed Doe with having suffered "an acute stress reaction" after an experience that made her "feel like something uncomfortable and untoward occurred." Berg also concluded that Doe had an adjustment disorder, with anxious and depressed features. Both conditions were "time-limited," in Berg's opinion. Based on Berg's observations of Doe's

21

presentation and the results of psychological testing performed by Berg and Reading, Berg concluded that Doe "has a gross tendency to misperceive, misjudge, particularly when she's emotionally activated." Berg also opined that once Doe commits herself to a particular perception, she "hunkers down psychologically."

During her testimony, Berg expressly declined to address whether Doe misperceived JB grabbing her breasts, testifying that she had not been present in the massage room. She did agree, when asked whether such misperception was possible, "when someone like Ms. Doe is in [a hypervigilant state], . . . that she then perceived [JB's] hands closer to her breasts than they actually were." But this testimony addressed a possible, even likely, reaction that a person in Ms. Doe's state might have had. Berg did not opine that Doe in fact misperceived events in the massage room, and she testified that the psychological testing found no evidence that Doe was malingering. Berg also acknowledged that Doe had been consistent in her reports of what happened during the massage.

### 2. Analysis

Doe contends the trial court erred by admitting Dr. Berg's opinion. We reject this contention on two independent grounds.

First, Doe has forfeited this claim by failing to object to almost all of the questions asked of Berg at trial. Doe had filed a motion in limine asking the court to exclude Berg's testimony regarding what Doe perceived and whether Doe was a credible witness. But ruling pretrial, the trial court denied the motion "for now" and informed the parties it would "address that on a question-by-question basis." Doe did not object on a question-by-question basis, and thus did not preserve the issue for appeal. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 452–453.) Because the trial court did not clearly

22

rule against her on the merits pretrial, her argument based on Evidence Code section 353, subdivision (a) and cases like *People v. Morris* (1991) 53 Cal.3d 152 (disapproved on other grounds by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1) is beside the point.  (See, e.g., *Morris*, at pp. 189–190 [motion in limine to exclude evidence preserves issue if "the motion is made at a time . . . when the trial judge can determine the evidentiary question in its appropriate context," and motion is "clearly and unequivocally denied"].)

Even if Doe had not forfeited this claim, it fails on the merits.  " 'As a general rule, the opinion of an expert is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ."  [Citation.]  Additionally, in California, "testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." ' " (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972.)  In this case, the trial court acted within its discretion in concluding that testimony by both Berg and Reader would assist the jury in assessing how Doe's mental health issues affected her perceptions during the incident that gave rise to this litigation.

Doe makes three general objections to Berg's testimony.  First, she contends that Berg invaded the jury's role of deciding " 'guilt or innocence.' " (Quoting *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 55.)  As this is not a criminal case, the jury was not asked to decide guilt or innocence, but to decide whether JB committed the acts alleged by Doe.  To assist the jury in making that determination, Doe herself presented evidence of her mental health issues, including expert testimony from a psychologist.  The trial court did not abuse its discretion by admitting the defense expert's opinions addressing the same subject.

23

Doe also posits that Berg invaded the jury's role by offering an opinion that "in effect" told the jury that Doe's testimony was "probably" false. This argument is premised on an advocate's interpretation of Berg's testimony that we decline to adopt. As our background summary reflects, Berg testified that she was not in the massage room and did not know whether Doe's account was accurate or not. Her testimony properly focused on psychological factors that may have impacted Doe's perceptions. Doe acknowledges that " '[a]n expert's opinion regarding a mental disorder' " may be admitted " 'to inform the jury of the effect a certain medical condition may have on the witness.' " (Quoting *People v. Long* (2005) 126 Cal.App.4th 865, 871.) Berg's testimony was of precisely this nature.

Finally, Doe contends that Berg's testimony should have been excluded under Evidence Code section 352. This argument rests on a conclusory allegation that Berg's testimony was irrelevant, which we reject. Moreover, in arguing prejudice, Doe contends that the jury was likely persuaded by Berg's testimony "to conclude the assault didn't happen." Assuming that Berg assisted the jury in making such a determination, that would not be undue prejudice. "Evidence Code section 352's reference to 'prejudice' does not mean 'damaging' to a party's case. It means evoking an emotional response having very little to do with the issue on which the evidence is offered." (*Coyne v. De Leo* (2018) 26 Cal.App.5th 801, 823.)

## C. Complaints of Sexual Conduct By and Against Nonparties

Doe contends the trial court committed prejudicial error by excluding evidence that other spa patrons had complained about sexual conduct by massage therapists other than JB.

### 1. Additional Background

The Claremont filed an in limine motion to exclude evidence of unrelated sexual harassment or assault complaints that were made against other massage therapists who had worked at the Claremont. According to the motion, Doe intended to introduce evidence of six complaints, most of which were made before the Claremont defendants owned or controlled the property. Defendants argued the evidence was irrelevant and prejudicial. Opposing the motion, Doe acknowledged the complaints did not involve JB and were not relevant to prove he committed sexual misconduct, but she argued the evidence was probative of the Claremont's liability for ratifying JB's conduct and for failing to prevent it.

The trial court granted defendants' motion to exclude the unrelated complaints, setting forth its findings in a multi-page ruling that emphasized this evidence was simply not relevant here. The court explained that because Doe's claims arose out of alleged misconduct by JB, her allegations required a "case-specific evaluation," rather than "an overall assessment that might typically be made by a regulatory agency, such as OSHA might make for health and safety issues." The court noted that Doe failed to provide California authority supporting the admissibility of evidence associated with sexual misconduct by someone other than the alleged perpetrator.

The court also found that the other-complaint evidence was not probative of the Claremont's duty of care to Doe. The court reasoned that there was no issue the defendants were on notice that a sexual assault could occur at the spa. Nor was there a dispute that the Claremont had a duty to attempt to eliminate sexual misconduct at its spa operations because the Claremont defendants had acknowledged that duty. (Distinguishing *Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586, 593 (*Janice H.*).)

Instead, the issue in this case was whether the Claremont was on notice that JB "presented an inappropriate risk of sexual misconduct."

The court also excluded evidence of these unrelated complaints pursuant to Evidence Code section 352. As support for this ruling, the court found that admitting the evidence would necessitate a mini trial as to each complaint. Without information to evaluate whether the complaints were verified, and the sufficiency of the Claremont's investigation of those prior incidents, admitting the complaints would be highly prejudicial, the court found. The court also found that allowing complaints of "sexual misconduct unrelated to [JB]" would be an undue consumption of time and confuse the jury.

## 2. Analysis

Doe contends the trial court abused its discretion under Evidence Code section 352. According to Doe, evidence that the Claremont had received "similar" complaints in the past was relevant because it "informed" whether the Claremont defendants satisfied or breached their duty of care in this case. We disagree that the trial court abused its discretion, and in any event, in light of the jury's verdict we find no prejudice even if the ruling were error.

The trial court did not abuse its discretion in excluding, pursuant to Evidence Code section 352, evidence that *other* spa clients made allegations against *other* massage therapists. This evidence was only marginally relevant as to the Claremont defendants, who did not dispute they were on notice that an assault could occur at the spa. As even Doe conceded in the trial court, the evidence was not probative of issues pertaining to JB or what he did. Moreover, admitting the evidence would have been time consuming and posed risks of confusing the jury and unduly prejudicing the defendants. On appeal, Doe argues that this concern about prejudice is "unfounded." We

26

disagree. Considering that the unrelated complaints involved allegations of sexual misconduct, they could well have been inflammatory. Moreover, admitting this evidence could have created a prejudicial risk that the jury would perceive the unrelated incidents as support for Doe's allegations about what JB did to her.

In her reply brief, Doe refines her theory of relevancy by shifting her focus to the issue of foreseeability. Doe posits that the excluded evidence was relevant because " '[p]rior similar incidents are helpful to determine foreseeability.' " (Quoting *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 127.) *Isaacs* held that a business proprietor may be liable for foreseeable criminal acts by third parties on the premises, even if there were no prior similar incidents (*id*. at p. 125), but *Issacs* does not support Doe's contention because the defendants in this case did not dispute that an assault at their spa was a foreseeable occurrence, nor was there an open issue, after the directed verdict in Doe's favor, as to whether they were liable if JB had committed the tortious acts of which he was accused.

In the same vein, Doe fails to persuade with her reliance on *Janice H.*, *supra*, 1 Cal.App.5th 586, which the trial court distinguished in its order granting the Claremont's motion in limine. *Janice H.* was an appeal by the proprietor of a dance club that was held liable for the plaintiff's damages arising from a rape committed against her by the club's busboy, Victor, in a club bathroom. (*Id*. at pp. 589–591.) The jury found that Victor was liable for sexual battery and the club was liable for negligence. (*Id*. at p. 592.) Affirming the judgment, the *Janice H.* court found no error in admitting evidence of sexual misconduct by Victor's brother Mario, who also worked at the club. That evidence showed that the club's manager had previously fired Mario from a job at a nearby club for having sex in the bathroom, and then

27

subsequently hired both Mario and Victor to work at the club where plaintiff was assaulted.  (*Id*. at pp. 591, 600.)  Evidence of Mario's prior misconduct was probative of the club's culture of laxity in enforcing its policies prohibiting sexual conduct on club premises, especially because Mario was made responsible for training Victor about how to engage with patrons.  (*Id*. at pp. 597, 600–601.)  For this reason, the *Janice H.* court approved admitting the evidence as probative of the plaintiff's claims against the club for premises liability and for negligently hiring Victor.  (*Id*. at pp. 600–601.)  Doe made no similar argument about the relevance of the other-complaint evidence in this case, and while the foreseeability of harm was the primary disputed issue in *Janice H.*, it was not at issue here.

In any event, Doe is not entitled to a new trial unless she can prove that the exclusion of other-complaint evidence was not only an abuse of discretion, but prejudicial.  That is, she must demonstrate " ' "it is reasonably probable that a result more favorable to [her as] the appealing party would have been reached in the absence of the error." ' " (*640 Octavia LLC v. Walston* (2025) 111Cal.App.5th 861, 869.)  Doe does not, and cannot, make that showing.  The jury found no liability because it found JB had neither intentionally nor negligently touched Doe in an offensive manner.  In light of this jury finding, issues of whether the Claremont defendants owed Doe a duty of care to protect her from sexual assault, or breached any such duty by negligently hiring and supervising JB are of no more than academic interest at this point.  Because the jury found insufficient evidence that JB committed the alleged assault, Doe could not prove that any duty the Claremont defendants may have breached caused the injury she alleged.

## II. Directed Verdict In Favor of Property Owner

Doe contends the trial court erred by granting a directed verdict to Claremont Hotel Properties, LLC (Claremont Properties), the owner of the property. The power to grant a directed verdict " 'exists in favor of the defendant where there is no substantial evidence tending to prove all the controverted facts necessary to establish the plaintiff's case.' " (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 102 (*Paterno*).) "On appeal, we decide de novo 'whether sufficient evidence was presented to withstand a directed verdict. [Citation.] In that sense, we stand in the shoes of the trial court.' [Citation.] And we will reverse if there was substantial evidence tending to prove appellants' case and the state of the law supports the claim." (*North Counties* [*Engineering*], *Inc. v. State Farm General Ins. Co.* (2014) 224 Cal.App.4th 902, 920.)

The recorded judgment in this case reflects that Claremont Properties was granted a directed verdict. However, we do not find the court's order in the Appellant's Appendix, nor does Doe direct this court to an oral ruling on the matter. Indeed, Doe does not even share the substance of the order that she purports to challenge on appeal. Under these circumstances, we deem the issue forfeited. (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743 [appellant forfeits claim of error by failing to cite the record] *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [collecting authorities].) We are not required to examine an undeveloped claim or to make arguments for parties. (*Paterno, supra,* 74 Cal.App.4th at p. 106; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545.)

Even if the claim were not forfeited, it fails on the merits. Doe contends first that the jury could have found that Claremont Properties was negligent pursuant to a theory of premises liability. (Citing *Lopez v. Superior*

*Court* (1996) 45 Cal.App.4th 705, 715 [commercial landlord has duty to keep premises in "reasonably safe condition"].) But Doe fails to identify an unsafe property condition, or to establish any other element of a premises liability claim against this defendant. Next, Doe suggests that Claremont Properties was vicariously liable for the negligence of Accor, the hotel's operator, pursuant to an agency theory. (See Civ. Code, § 2338.) But Doe fails to cite the allegedly undisputed trial evidence showing that Accor operated the spa as the agent of Claremont Properties. Finally, Doe fails to reckon with the fatal flaw in her case, as it comes to us on appeal: the jury has found that JB did not commit the alleged assault, a finding we have found no grounds to disturb on appeal. As a result, none of the Claremont defendants, including Claremont Properties, can be liable for the damages Doe alleges.

## III. Jury Instructions and Verdict Form

Doe contends the jury instructions and verdict form were erroneous because they precluded her from presenting a valid theory of negligence liability to the jury. " 'The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citation] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration.' " (*Strouse v. Webcor Construction, L.P.* (2019) 34 Cal.App.5th 703, 713.) But with this challenge, too, Doe is entitled to relief only if she establishes an error was prejudicial. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*) ["judgment may not be reversed for instructional error in a civil case" unless " 'it seems probable' that the error 'prejudicially affected the verdict' "].)

### A. Additional Background

Before the case went to the jury, Doe objected to the special verdict form on the ground that questions about sexual battery and negligence were

30

"specific to" JB, despite the fact that Doe's claims were alleged against the Claremont. The court responded that in light of the directed verdicts, any liability as to JB would automatically establish the liability of the Claremont. Accordingly, the court found no need to have separate questions directed specifically at the liability of those defendants.

Trial then reconvened and the court instructed the jury. Regarding the allegations Doe had made about JB, the jury was instructed that Doe alleged she was harmed by JB's negligence, and it was given the elements Doe had to establish to prove that claim. It was instructed that Doe claimed JB committed a sexual battery, and given the elements of that claim. The court also instructed regarding principles of vicarious liability and Doe's claim that the Claremont defendants were liable for harm allegedly caused by JB. Pertinent here, the jury was instructed: JB was an employee or agent of both remaining Claremont defendants; JB was acting in the course and scope of his employment or agency when the conduct occurred; the Claremont defendants "ratified [JB's] conduct and are therefore responsible for his conduct"; and Jane Doe claimed that she was harmed by JB's conduct. The jury was not instructed on the theory Doe presses here, that the Claremont defendants were liable on a theory of premises liability.

### B. Analysis

A party is entitled to have the jury consider a valid theory of liability that is supported by the evidence. (*Sills v. Los Angeles Transit Lines* (1953) 40 Cal.2d 630, 633 (*Sills*) [trial court erred by precluding personal injury plaintiff from relying on last clear chance doctrine when evidence supported it].) Citing *Sills*, Doe contends the trial court committed reversible error by precluding the jury from considering Doe's theory that the Claremont

31

defendants breached their duty of care as proprietors of the spa by failing to protect Doe from JB.

We have some doubts as to whether Doe had a separate theory of premises liability that was supported by substantial evidence, but putting those doubts aside for present purposes, we conclude Doe's premises liability theory was rendered irrelevant before the case was submitted to the jury. (*Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1158 (*Diaz*).) The directed verdicts established that the Claremont defendants were JB's employers and ratified his conduct, which meant they were liable "irrespective of fault" for JB's conduct in the scope of his employment. (*Id.* at p. 1154.) These directed verdicts are not challenged in a cross-appeal, so Doe's alternative theory that the Claremont owed her a duty to protect her from JB because they were business proprietors was and is superfluous. (*Id.* at p. 1158, 1160.) Doe was not entitled to instruction, or a jury verdict, on a theory that would have been irrelevant and confusing. (*Zannini v. Liker* (2022) 74 Cal.App.5th 610, 623.)

Doe acknowledges that the directed verdicts precluded her from pursuing her alternative theories for holding the Claremont liable as JB's employer, but posits her premises liability theory remained viable. She asserts the trial court concluded otherwise because it misconstrued *Diaz*, *supra*, 51 Cal.4th 1148. We disagree. The *Diaz* plaintiff was injured in a car accident involving two other drivers. (*Id.* at p. 1152.) She alleged that both other drivers were negligent, and that the employer of one of the drivers was (1) vicariously liable for the negligence of its employee and (2) directly liable for its own negligence in hiring and retaining the employee. (*Ibid.*) The employer admitted vicarious liability if its employee was found negligent, but the trial court nevertheless permitted the plaintiff to introduce evidence of her direct negligence theory against the employer, and instructed the jury

32

regarding that theory. (*Id*. at p. 1153.) The jury found all three defendants were negligent and that the employer-defendant was also vicariously liable for its employee's negligence. (*Id*. at pp. 1153–1154.) However, the Supreme Court reversed the judgment, concluding the trial court erred by admitting evidence and giving instruction regarding the plaintiff's direct negligence theory against the employer, after the employer admitted its vicarious liability for its employee's negligence. (*Id*. at p. 1154.)

The *Diaz* court found that once the employer-defendant admitted vicarious liability for the negligence of its employee, the plaintiff's other negligence theories against the employer-defendant became irrelevant because all of the plaintiff's causes of action against the employer depended on the employee's negligent driving during the course of the employment. (*Diaz*, *supra*, 51 Cal.4th at p. 1157.) In other words, vicarious liability and direct negligence were " 'alternative theories' " under which the plaintiff sought to impose on the employer the same liability as might be imposed on the employee, and once the employer's liability for the employee's conduct was established, there was no " 'material issue' " to justify admitting evidence of the plaintiff's direct negligence theory. (*Id*. at p. 1155.) This aspect of *Diaz* is directly on point. All of Doe's causes of action depended on her contention that JB's conduct during the course of employment was the cause of her injury. Thus, once the Claremont's vicarious liability for JB's conduct was established, Doe's other negligence theories became irrelevant, and the trial court did not err in precluding Doe from presenting them to the jury.

Even if Doe could show that eliminating her alternative duty theory was error, she fails to articulate a valid theory of prejudice. (See *Paterno*, *supra*, 74 Cal.App.4th at p. 107 ["error in eliminating a legal theory from a case is not categorically reversible"]; *Soule*, *supra*, 8 Cal.4th at p. 580.) Doe

33

filed and pursued this action to recover damages and injunctive relief arising from an alleged sexual assault. She insists the Claremont defendants were liable for her harm because of their direct negligence and also by virtue of their relationship to JB. But these theories are no more than two ways of alleging liability for the exact same harm. And the trier of fact found that JB did not assault Doe or commit any other negligent act that caused her harm. Doe does not challenge the jury's findings on appeal, thus precluding her from showing prejudice in relation to the exclusion at trial of her alternative duty theories.

## IV. Postjudgment Orders

Doe appeals postjudgment orders awarding the Claremont costs and attorney's fees. Rulings on both matters were set forth in an eight-page order after hearing issued on February 27, 2023 (the February 2023 order). The court awarded more than $108,000 in costs, which included expert fees granted pursuant to Code of Civil Procedure section 998.[5] The court also granted around $39,000 as compensation for attorney's fees incurred to prove facts Doe denied during discovery. (§ 2033.420.)

### A. Costs

#### 1. Additional Background

Defendants' memorandum of costs requested $ 112,171.52, which included costs recoverable as the prevailing party at trial (§ 1032) as well as reimbursement for expert fees pursuant to section 998. As support for their section 998 request, defendants provided a copy of an offer to compromise they made to Doe on February 14, 2022. Pursuant thereto, defendants had offered to pay $450,000 in exchange for dismissal of the action with prejudice

---

[5] Statutory references are to the Code of Civil Procedure unless otherwise indicated.

34

pursuant to a general release.  The section 998 offer also stated:  "To accept this offer, you must execute and serve the attached General Release prior to trial or within thirty (30) days . . ."  The general release attached to the offer contains a signature line above the words "Plaintiff, Jane Doe."

Doe filed a motion to strike or alternatively tax defendants' costs.  She moved to strike all costs on the ground that awarding defendants costs in a "civil rights" action would violate public policy.  Alternatively, she moved to tax costs in the amount of $60,635.97, which included two categories relevant to this appeal:  $8,539 for fees defendants paid to Doe's experts to take their depositions; and $46,220.75 for other expert fees paid by the defendants.  Doe argued the Claremont could not recover expert fees under section 998 or any other statute.  Doe acknowledged that they had made an offer to compromise that she did not accept, but she argued the section 998 offer was invalid because it did not provide a way for her counsel to accept the offer on her behalf.

Opposing Doe's motion to strike or tax costs, the Claremont disputed all of Doe's arguments.  But they acknowledged an error in their original cost memorandum which reduced the total amount of their request to $108,063.72.

In its February 2023 order, the trial court denied Doe's motion to strike all costs, providing a detailed ruling that Doe does not challenge on appeal. Then the court granted in part and denied in part Doe's motion to tax costs. This motion was granted only with respect to costs defendants had conceded they could not recover, and was otherwise denied.  Accordingly, defendants were awarded costs totaling $108,063.72.

As to the inclusion of expert fees, the court found that the Claremont defendants were entitled to postoffer expert fees pursuant to section 998

35

because they made a valid settlement offer and Doe did not obtain a more favorable judgment at trial. The court rejected Doe's contention that the offer was invalid because it did not contain a signature line for her counsel. The court also rejected Doe's contention that deposition fees paid to her own experts were not recoverable. And the court explicitly refused to consider additional grounds for taxing expert fees that Doe attempted to raise for the first time in her reply brief.

### 2. Analysis

Section 998 provides, in part: "Not less than 10 days prior to commencement of trial . . ., any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time. The written offer shall include a statement of the offer, containing the terms and conditions of the judgment or award, and a provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted. Any acceptance of the offer, whether made on the document containing the offer or on a separate document of acceptance, shall be in writing and shall be signed by counsel for the accepting party or, if not represented by counsel, by the accepting party." (§ 998, subd. (b) (§ 998(b)).)

Section 998, subdivision (c) provides further that, if the plaintiff fails to accept a defendant's offer to settle a case pursuant section 998, and the plaintiff fails to obtain a more favorable judgment, the plaintiff "shall pay the defendant's costs from the time of the offer." (§ 998, subd. (c)(1).) In addition, subject to exceptions not applicable here, the court has discretion to order the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses. (*Ibid.*)

36

An order awarding fees under section 998 is reviewed for abuse of discretion. (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1262.) Here, Doe contends the trial court not only abused its discretion but committed an error of law by overruling her objection that the Claremont's section 998 offer was invalid. To the extent Doe's claim turns on a question of statutory interpretation, our review is de novo. (*Rouland v. Pacific Specialty Ins. Co.* (2013) 220 Cal.App.4th 280, 285 (*Rouland*).)

In 2006, the Legislature amended section 998 "to specify the requirements for a valid settlement offer and acceptance." (*Rouland*, *supra*, 220 Cal.App.4th at p. 285.) These amendments were intended to " 'eliminate uncertainty by removing the possibility that an oral acceptance might be valid.' " (*Rouland*, *at* p. 285, quoting *Puerta v. Torres* (2011) 195 Cal.App.4th 1267, 1273 (*Puerta*); see also *Boeken v. Philip Morris USA Inc.* (2013) 217 Cal.App.4th 992, 1003.) Accordingly, the offer must be in writing, contain a statement of terms, and include a provision that allows the accepting party to indicate acceptance by signing a statement to that effect. (§ 998(b).)

Doe contends that the Claremont's section 998 offer was invalid because "it required Doe herself to sign" in order to accept the offer, whereas section 998 mandates signing by the accepting party's counsel. We reject this contention because we disagree with Doe's construction of the Claremont's offer. That offer was expressly directed at Doe *and* her attorneys of record, and it was sent to Doe's attorneys. The offer stated that "you" must execute and serve the release in order to accept the offer. It did not state that Doe was required to personally sign the acceptance.

Doe argues that ambiguities in the offer must be construed in her favor. (Citing *Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86.) But she fails to identify an ambiguity in the substance of the offer that was served on her

37

counsel. Instead, she contends that the offer was rendered ambiguous by the fact that the words "Plaintiff, Jane Doe," were typed below the signature line on the general release. According to Doe, resolving this ambiguity in her favor means that the offer must be construed as mandating her personal signature. We disagree. After all, Doe's real name is not Jane Doe, and she points to nothing that prevented her attorneys from signing the release on her behalf. Moreover, as the trial court pointed out in its order, the general release stated that it would be " 'subject to enforcement' " pursuant to section 664.6, which states that a writing is signed by a party when it is signed by an attorney who represents the party. (§ 664.6, subd. (b)(2).)

Doe also appears to rely on the requirement that a section 998 offer must include "a provision that allows the accepting party to indicate acceptance of the offer by signing a statement that the offer is accepted." (§ 998(b).) To comply with this requirement, "the manner of acceptance must be indicated in the offer." (*Puerta, supra,* 195 Cal.App.4th at p. 1273 [offer that did not include any provision for acceptance was invalid under section 998].) The requirement was satisfied here, as the offer stated that it could be accepted by executing and serving the general release.

Doe takes the position that a provision for accepting a section 998 offer is invalid as a matter of law if it does not contain a signature line that is expressly designated for the accepting party's counsel. Pertinent authority is to the contrary. "Nothing in the statute's language requires an offer to include either a line for the party to sign acknowledging its acceptance or any specific language stating the party must accept the offer by signing an acceptance statement. Indeed, no ' "magic language" ' or specific format is required for either an offer or acceptance under section 998. [Citations.] The offer's acceptance provision simply must specify the manner in which the

38

offer is to be accepted [citations], and the only statutory requirements for a valid acceptance mandate a written acceptance signed by the accepting party or its counsel [citation]. We may not impose any additional requirements or limitations that do not appear on the face of the statute." (*Rouland*, *supra*, 220 Cal.App.4th at p. 288.)

Doe attempts to challenge the inclusion of expert fees in the cost order on two additional grounds. First, she contends the section 998 offer was invalid because it incorporated a general release that was overbroad. Doe attempted to raise this issue for the first time in her reply brief in support of her motion to strike, but the trial court declined to entertain the untimely claim, as do we. (*Westsiders Opposed to Overdevelopment v. City of Los Angeles* (2018) 27 Cal.App.5th 1079, 1091 [" ' "issues or theories not properly raised or presented in the trial court may not be asserted on appeal" ' "].) Second, Doe argues that some expert costs included in the award were incurred before the Claremont made its section 998 offer. Doe forfeited this claim by failing to raise it in the trial court. (*Ibid*.)

## C. Attorney's Fees

### 1. Additional Background

While Doe's motion to strike was being litigated, the Claremont filed a motion for attorney's fees, pursuant to section 2033.420. The Claremont requested that Doe pay $50,042.20 as compensation for fees the defendants incurred to prove facts that Doe unreasonably denied in her responses to seven requests for admission (RFAs) during discovery. Specifically, Doe refused to admit that (1) she had no evidence to support the allegation in her complaint that JB intentionally threatened violence against her; (2) she had no evidence JB committed a violent act against her; (3) she had no evidence she was unable easily to end her relationship with any of the defendants;

39

(4) JB did not prevent Doe from leaving the massage room at any time during the incident; (5) FHR Management did not prevent her from leaving the massage room at any time during the incident; (6) JB was not an employee of Claremont Properties; and (7) Doe could not identify any employee or former employee of Claremont Properties who was involved in any way in the acts or omissions alleged in the complaint.

Doe opposed the attorney's fee motion on three grounds. First, she argued that the RFAs that she denied implicated statutory civil rights claims that do not authorize an attorney fee award to a prevailing defendant. Second, Doe argued that the Claremont failed to submit "admissible evidence" to establish that Doe denied the RFAs. Third, Doe asserted that she had reasonable grounds to deny the RFAs. Doe based this third assertion on Dr. Berg's testimony and related defense arguments that Doe had misperceived the event in question. Doe argued that her misperception of the event "simply does not meet the standards" for granting fees under section 2033.420.

In its February 2023 order, the trial court granted the defendants' motion for attorney's fees incurred to prove the RFAs. (§ 2033.420, subd. (a).) The court found that Doe did not dispute (1) that she denied multiple RFAs that involved matters of substantial importance in her case, or (2) that defendants incurred substantial expenses in proving the truth of matters that Doe refused to admit. Moreover, Doe failed to show an exception applied to preclude defendants from recovering their fees under section 2033.420. Accordingly, the court awarded reasonable attorney's fees in the amount of $39,140.00.

## 2. Analysis

Section 2033.420 provides: "If a party fails to admit . . . the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves . . . the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (§ 2033.420, subd. (a).) The court "shall make this order" unless it finds (1) an objection to the request was sustained or waived; (2) the admission requested was not of "substantial importance"; (3) the party that failed to make the admission "had reasonable ground to believe that that party would prevail on the matter"; or (4) there was some "other good reason" for failing to make the admission. (§ 2033.420, subd. (b).)

On appeal, we review a cost-of-proof attorney's fee award for abuse of discretion and the factual findings supporting the award for substantial evidence. (*Samsky v. State Farm Mutual Automobile Ins. Co.* (2019) 37 Cal.App.5th 517, 521.) Doe contends the trial court abused its discretion here because she had reasonable grounds for denying the RFAs. We disagree.

"The party seeking to benefit from an exception listed in section 2033.420, subdivision (b) ' "bears the burden to establish the exception." ' " (*Spahn v. Richards* (2021) 72 Cal.App.5th 208, 216 (*Spahn*).) " 'In evaluating whether a "good reason" exists for denying a request to admit, "a court may properly consider whether at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at trial." ' [Citation.] 'A party's reasonable belief must be grounded in the evidence; it cannot be based merely on "hope or a roll of the dice." [Citation.] It is also not enough for a party making the

41

denial to " 'hotly contest' " the issue; instead, "there must be some reasonable basis for contesting the issue in question before sanctions can be avoided." ' [Citation.]  A party's reliance on 'self-serving testimony' may be insufficient to establish a reasonable refusal to admit a request for admission."  (*Id.* at pp. 216–217.)

In the trial court, Doe's sole basis for contending she had reasonable grounds to deny the RFAs was that the trial evidence showed that she may have misperceived the event.  Doe repeats the contention on appeal, suggesting that evidence of her "truthfulness" somehow made her denials objectively reasonable.  The trial court did not abuse its discretion in finding this showing was insufficient to satisfy Doe's burden.  Indeed, totally apart from any question of Doe's credibility, her testimony did not provide a factual basis for denying the matters not admitted in the RFA's, which is why the trial judge awarded fees for the expense to the Claremont of filing motions for summary adjudication and directed verdict.

Doe attempts to remedy her inadequate trial court showing by making new arguments about why her denials should be deemed reasonable.  As these arguments were not made below, they do not alter our conclusion that Doe failed to carry her burden of establishing an exception to the statutory fee sanction.  Doe disagrees, contending that she can raise new issues now because the trial court abused its discretion by "disregarding known facts and evidence in the record."  But if other facts were relevant, it was Doe who disregarded them, as the burden was on Doe to establish she was entitled to a statutory exception to the fee sanction.  (*Spahn, supra,* 72 Cal.App.5th at p. 216.)  Having failed to carry that burden in the trial court does not entitle her to have new arguments entertained for the first time on appeal.

(*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 830.)

## DISPOSITION

The judgment and postjudgment orders are affirmed.  Costs on appeal are awarded to the respondents.


TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.


*Doe v. Accor Hotels & Resorts* (*Maryland*), *LLC, et al.* (A167247/A167591)